692            March 12, 2025            No. 207

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

HAYES OYSTER COMPANY,
*Petitioner-Appellant,*

*v.*

OREGON DEPARTMENT OF ENVIRONMENTAL
QUALITY,
*Respondent-Respondent.*

Tillamook County Circuit Court
19CV32805; A180606

Mari Garric Trevino, Judge.

Argued and submitted December 20, 2023.

Thomas R. Benke argued the cause and filed the briefs for appellant.

Carson L. Whitehead, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, Powers, Judge, and Hellman, Judge.

POWERS, J.

Affirmed.

**POWERS, J.**

Petitioner Hayes Oyster Company appeals from a judgment dismissing its petition for review in an other than contested case after the trial court concluded that petitioner lacked standing to challenge a permit issued by the Department of Environmental Quality (DEQ). Concerned about fecal coliform contamination in Tillamook Bay, petitioner challenged DEQ's modification of Solid Waste Disposal Site Permit #1550, which, broadly speaking, allows the Port of Tillamook Bay (POTB) to operate an anaerobic digestion composition facility in Tillamook, Oregon. In general terms, the modification of the permit changed POTB's authority from accepting only manure feedstock to allowing the acceptance of food waste feedstock. In more technical terms, the modified permit allowed POTB to accept and process non-animal mortality Type 3 feedstocks, in addition to the already allowed Type 2 feedstocks, in its anaerobic digester. In a single assignment of error, petitioner contends that the trial court erred by concluding that petitioner must have suffered an injury to a personal stake in the outcome of the controversy to have standing to challenge DEQ's order issuing the permit. For the reasons discussed below, we conclude that the trial court did not err. Accordingly, because petitioner lacks standing, we affirm.

## BACKGROUND

### A.   *Standard of Review*

Whether a petitioner has standing under ORS 183.480(1) is a question of law. *Cascadia Wildlands v. Oregon Dept. of State Lands*, 293 Or App 127, 131, 427 P3d 1091 (2018), *aff'd*, 365 Or 750 (2019). We begin with a brief description of the background and procedural facts, which are undisputed, focusing on the permit at issue.

### B.   *Background*

Prior to 2020, POTB operated a digester that allowed it to process Type 2 feedstocks (manure). The POTB digester accepts feedstocks from third parties and processes those feedstocks through an anaerobic process that results in digestate that then can be applied to fields. In 2020, DEQ issued its decision challenged in this proceeding, *viz.*,

a permit modification to allow POTB digester to process non-animal mortality Type 3 feedstocks (food waste) in addition to the already allowed Type 2 feedstocks. Both the prior permit and the 2020 permit include the same condition that requires POTB to ensure that its agricultural partners are properly qualified to receive the digestate. Specifically, the permits require POTB to receive "written approval from DEQ regarding any use of liquid digestate and location of use." Furthermore, both permits require POTB to provide DEQ with "documentation that agricultural operations that receive digestate have an [Oregon Department of Agricultural (ODA)] approved Animal Waste Management Plan or an ODA approved Nutrient Management Plan," and "[i]f applicable, the quantity of nutrients returned to an agricultural operation must not exceed the nutrient quantity of the manure delivered to the digester from that agricultural operation."[1]

It is also worth noting that the solid waste disposal permit is limited in scope: it is not a water quality permit and explicitly prohibits any direct or indirect discharge into Oregon waters. Moreover, the permit at issue is different from any permits a Confined Animal Feeding Operation (CAFO) may be required to obtain, such as a National Pollution Discharge Elimination System (NPDES) water quality permit or any farm management permits, such as an ODA approved Animal Waste Management Plan or Nutrient Management Plan (which may or may not authorize land application of digestates).

C.  *Parties' Arguments and Procedural History*

With that brief context in mind, we turn to the parties' arguments. Both parties agree that, at times, Tillamook Bay experiences shellfish harvest restrictions stemming

---

[1] The DEQ's 2020 permit, provides, in part:

"**Disposition of digestate**: The permittee must manage solid and liquid digestate in accordance with the facility's DEQ-approved Operations Plan. The permittee must receive written approval from DEQ regarding any use of liquid digestate and location of use. The permittee must provide to DEQ documentation that agricultural operations that receive digestate have an ODA approved Animal Waste Management Plan or an ODA approved Nutrient Management Plan. If applicable, the quantity of nutrients returned to an agricultural operation must not exceed the nutrient quantity of the manure delivered to the digester from that agricultural operation."

(Boldface in original.)

from fecal coliform contamination of the estuarine waters of Tillamook Bay, and that fecal coliform concentrations increase after some rain events. Petitioner, who cultivates and harvests oysters commercially in Tillamook Bay, contends that digestate applied to CAFOs, which contains fecal coliform, contributes to increased harmful bacteria levels in runoff following rain events, thereby contributing to the Tillamook Bay contamination.

In bringing this action, petitioner asserted that the Solid Waste Disposal Permit #1550 should be set aside for two reasons. First, petitioner argued that DEQ incorrectly assumed that digestate from Type 3 feedstocks may be applied on land pursuant to a CAFO NPDES General Permit. Second, petitioner asserted that DEQ failed to establish that discharges of fecal coliform from the POTB facility will not cause or contribute to a violation of the water quality standard for shellfish-growing waters.

DEQ filed a motion for summary judgment, arguing that petitioner lacked standing to challenge the agency action because petitioner was not a "person adversely affected or aggrieved" as defined by ORS 183.480(1) (describing standing for judicial review of a final agency order). DEQ asserted that petitioner's interest is predicated on the impact of fecal coliform pollution, and the 2020 permit modification authorizing POTB to accept non-animal mortality Type 3 feedstocks has no impact on that claimed interest. In support, DEQ presented unrebutted evidence that anaerobic digesters reduce levels of harmful bacteria, including eliminating 99 percent of fecal coliform, and that non-animal mortality Type 3 feedstocks contain very low levels of fecal coliform even before being processed by the digester. DEQ further argued that petitioner had not shown an injury to a substantial interest resulting directly from the permit or that it seeks to advance an interest the legislature expressly wished to have considered. Alternatively, DEQ argued that petitioner's claims fail as a matter of law.

Petitioner responded that it has satisfied its standing requirement because it has a substantial interest in the fecal coliform levels in Tillamook Bay and asserted that digestate applied to CAFOs contains fecal coliform that

could contribute to increases in harmful bacteria that would injure petitioner. Petitioner also argued that its legally cognizable interest is its right to cultivate and harvest oysters commercially in Tillamook Bay.

On cross-motions for summary judgment, the trial court dismissed petitioner's action for lack of standing. The court concluded that petitioner had not established that it is a "person adversely affected or aggrieved" by the agency order because petitioner had not suffered an injury to a substantial interest and did not have a personal stake resulting from the digester permit, thereby failing to meet the requirements for standing. The court explained:

"[A]ccording to Jeremy Fleming, an environmental engineer intimately involved with the digester and its permitting process, [the digester] actually decreases the amount of fecal coliform bacteria entering the bay. Petitioner has produced absolutely no evidence to the contrary from a qualified expert or engineer. Instead, there is some speculation contained within the pleadings about the interaction between Type 2 and Type 3 digestate and its application to farmers' fields. *** Without it, there is no record evidence that Petitioner qualifies as a person who has suffered an injury to a substantial interest or a personal stake resulting directly from the digester permit as required by ORS 183.480(1) to challenge this agency order."

Petitioner timely appealed.

D.  *Parties' Arguments on Appeal*

On appeal, petitioner argues that it has standing because it suffered an injury to a substantial interest and has a "personal stake" in the outcome of the controversy in that its ability to harvest oysters is directly impaired by agricultural stormwater discharges in the Tillamook Bay watershed. DEQ asserts, as it did before, that the permit modification only adds for the acceptance of non-animal mortality Type 3 feedstocks, which is already low in fecal coliform, that the digestate process reduces fecal coliform, and that other permits regulate the application of digestate on farms. Thus, DEQ asserts that the petitioner does not have standing because it made no showing that it suffered an injury to a substantial interest resulting directly from

the permit and it does not have a personal stake in the permit modification. For the reasons discussed below, we reject petitioner's arguments on appeal and affirm the trial court's dismissal.

## ANALYSIS

ORS 183.480(1), which defines standing for purposes of the Administrative Procedures Act, provides, in part:

> "any person adversely affected or aggrieved by an order or any party to an agency proceeding is entitled to judicial review of a final order, whether such order is affirmative or negative in form."

The Oregon Supreme Court has explained that a person is "aggrieved" if the person shows one or more of the following factors: (1) the person has suffered an injury to a substantial interest resulting directly from the challenged governmental action; (2) the person seeks to further an interest that the legislature expressly wished to have considered; or (3) the person has such a personal stake in the outcome of the controversy as to assure concrete adverseness to the proceeding. *People for Ethical Treatment v. Inst. Animal Care*, 312 Or 95, 817 P2d 1299 (1991), *abrogation on other grounds recognized by Couey v. Atkins*, 357 Or 460, 515, 355 P3d 866 (2015) (*PETA*).[2] With respect to the first *PETA* factor, to establish standing the petitioner must show that there is a nonspeculative inference that petitioner's interests will be injured as a consequence of the action. *McNichols v. Department of Fish and Wildlife*, 308 Or App 369, 372, 482 P3d 208 (2021). With respect to the third *PETA* factor, a "personal stake" in the outcome means that the decision will legally affect the petitioner in some way. *Multnomah County v. Talbot*, 56 Or App 235, 242-43, 641 P2d 617 (1982). An "aggrieved person" does not include persons who are merely dissatisfied with the agency order. *Marbet v. Portland Gen. Elect.*, 277 Or 447, 457, 561 P2d 154 (1977).

Petitioner contends that it has satisfied the first *PETA* factor. Petitioner asserts that, because digestate

---

[2] Petitioner does not contend that it has standing under the second *PETA* factor, asserting that it has an interest that the legislature expressly wished to have considered. Thus, the only factors discussed in this analysis are the first and third *PETA* factors.

applied to CAFOs contains fecal coliform that has potential to contribute to increases of harmful bacteria levels, petitioner has suffered an injury to a substantial interest—reduction in its ability to harvest shellfish—resulting directly from the grant of the permit. Petitioner is correct that such an economic interest can support standing under the first *PETA* factor; however, what is missing here is evidence that would support a nonspeculative inference that those interests will be injured as a consequence of allowing non-animal mortality Type 3 feedstocks in the digester. Specifically, DEQ presented unrebutted evidence that non-animal mortality Type 3 feedstock was low in fecal coliform before it entered the digester. Although Type 2 feedstock, manure, is higher in fecal coliform, the permit already allowed for the acceptance of manure. Further, DEQ presented unrebutted evidence that the digester reduced levels of fecal coliform by eliminating over 99 percent of that bacteria. Although petitioner's concern is understandable given its economic interest in clean water, just as we observed in *McNichols*, 308 Or App at 373, we do not understand *PETA* to allow for standing based on an apprehension that the action may injure a petitioner's interest. Rather, the first *PETA* factor requires a showing of how the action will injure the person's interest, not a general objection without specifics.

Turning to the third *PETA* factor, petitioner has not shown a personal stake in the outcome of the controversy as to assure concrete adverseness to the proceeding. *See*, *e.g.*, *IBEW Local 89 v. Wallan*, 326 Or App 796, 800, 533 P3d 1134 (2023) (explaining that the third PETA factor requires a demonstration that the challenged action will "legally" affect the petitioner and that the legal effect must be particularized to the petitioner). Petitioner asserts that it has a personal stake in the outcome because its ability to harvest oysters is directly impaired by agricultural stormwater discharges in the Tillamook Bay watershed. Petitioner asserts that the application of digestate derived from food waste directly implicates its interest in harvesting oysters because that digestate is added to the manure disposal system, which causes fecal coliform to enter the bay. Petitioner also contends that it has standing because "will legally affect" is not an element of the personal stake basis for

standing. Petitioner does not offer an alternative definition or explanation but argues that whatever "legally cognizable interest" or "legally affect" mean, they do not mean that a petitioner must adduce evidence that it has suffered an injury to a personal stake to have standing to challenge an administrative order.

As articulated in *Talbot*, 56 Or App at 242-43, a personal stake in the outcome means that the agency's decision will legally affect the petitioner in some way. We explained that the tax assessor had a legally cognizable interest in assuring the date of the assessed value of classified property is frozen was accurate, which was the decision disputed by the tax assessor. *Id.* We concluded that, because there was "statutorily imposed involvement" under the legislative framework, that involvement was sufficient to give the assessor standing. *Id.* Unlike the tax assessor, petitioner does not have any legally cognizable interest in the present case because petitioner is not legally implicated in any way by the permit modification, which allows for the addition of non-animal mortality Type 3 feedstocks to be processed by the digester. Whether petitioner may have a legal interest in the amount of fecal coliform applied to land is beyond the scope of the permit at issue in this case; here, petitioner's interest does not provide the requisite "personal stake" in the outcome of DEQ's decision challenged in this case.

Affirmed.